Joseph V. Womack
**Waller & Womack, P.C.**
Suite 805 US Bank Building
303 North Broadway
Billings, MT 59101
Telephone: (406) 252-7200
Fax: (406) 252-4266
Email: jwomack@jvwlaw.com
Attorney No. 2641
Attorney for Trustee

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In Re: | |
| **THE LODGE AT BIG SKY, LLC** | Case No.  10-62229 |
| Debtor(s) | |
| In Re: | |
| **THE LODGE AT BIG SKY MANAGEMENT COMPANY , LLC** | Case No.  10-62230 |
| Debtor(s) | |

**MOTION OF THE CHAPTER 7 TRUSTEE PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 363(f), AND FED. R. BANKR. P. 2002(a)(2), AND 6004 FOR ORDERS: (A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE REAL AND PERSONAL PROPERTY OF THE ESTATE FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES; (B) APPROVING BIDDING PROCEDURES AND AUTHORIZING THE TRUSTEE TO SOLICIT HIGHER AND BETTER OFFERS PURSUANT TO PROPOSED NOTICE OF SALE; AND (C) GRANTING RELATED RELIEF**

**COMES NOW** Joseph V. Womack, the duly appointed Chapter 7 trustee in the above-

captioned chapter 7 cases (the "Trustee"), and respectfully moves this Court, pursuant to 11

U.S.C. 11 §§ 105(a), 363(b), 363(f), and Fed. R. Bankr. P. 2002(a)(2), and 6004, for the entry of

orders:

(a)     authorizing and approving the sale of the Assets (as hereinafter defined) free and clear of all liens, claims and encumbrances and other interests (the "Sale");

(i)     pursuant to Section 363 of the Bankruptcy Code [11 U.S.C. § 363] and pursuant to an Asset Purchase Agreement substantially in the form attached hereto as Exhibit A (the "Asset Purchase Agreement")[1] by and between the Trustee and GSQ FUNDING, L.P. (such entity or its designee, the "Stalking Horse Bidder" or "GSQ"); or

(ii)    pursuant to Section 363 of the Bankruptcy Code to a qualified bidder who makes the highest and best offer for the Assets at an auction (the "Auction") pursuant to the Bidding Procedures as the same may be approved by the Court (a "Successful Bidder," which term, to the extent required, shall include the Stalking Horse Bidder);

(b)     approving the Bidding Procedures as set forth in the (Proposed) Notice by Chapter 7 Trustee of Bidding Procedures and Intended Sale of Real and Personal Property and Deadline for Submitting Objections and Higher Offers and Hearing Date  form attached hereto as Exhibit B ("Notice of Sale");

(c)     approving and authorizing the payment to First Financial Bank, NA ("First National"), successor in interest to Irwin Union Bank & Trust, out of escrow of the net proceeds of the sale of the Real Property after funding of reserves for senior lien claims, if any, and a reserve for the fees and expenses of the Trustee per the existing agreement between First Financial, and the Trustee provided however, that this amount cannot exceed the indebtedness owed to First Financial Bank that is secured by its Senior Prepetition Lien;

(d)     approving the form and manner of the Notice of Sale;

(e)     ruling that any objections to the sale of the Assets, or the sale of the Assets free and clear of all liens, claims, encumbrances, and other interests in the Assets that are not resolved at the Bidding Procedures Hearing are to be considered and ruled upon by the Court at the Sale Hearing;

(f)     Establish the Due Diligence Termination Date for the Stalking Horse Bidder as defined in the Asset Purchase Agreement;

(g)     Approving the Break-up Fee and directing payment of the Break-up Fee in the event the Stalking Horse Bidder is not the Winning Bidder;

(h)     Scheduling a time and place at which the Auction is to be conducted; and

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Asset Purchase Agreement attached hereto as Exhibit A or the Notice of Sale and Bidding Procedures attached hereto as Exhibit B.

(i)     Scheduling a hearing at which the results of the Auction are to be approved or disapproved by the Court and any objections not resolved at the Bid Procedures Hearing or that require an evidentiary hearing are to be ruled upon by the Court (the "Sale Hearing").

In support hereof, the Trustee respectfully states as follows:

## BACKGROUND
## Relevant Procedural and Factual History

1.      Jeffrey Quackenbush ("Quackenbush") is the managing member of The Lodge At Big Sky, LLC ("Lodge") and The Lodge At Big Sky Management Company, LLC ("Management") (Lodge and Management shall be referred to collectively as "Debtors").  Lodge and Management are single member limited liability companies.  On December 31, 2007, Quackenbush, through Lodge, purchased real property consisting of 85 condominium units located at 75 Sitting Bill Road, Big Sky, Montana, described in the Exhibit 1 attached to the "Asset Purchase Agreement", attached hereto as Exhibit A ("Real Property").  The Real Property, located at the base of Big Sky Ski Resort in what is known as Mountain Village, was built and operated as a hotel but was later converted to 90 condominium units.  Five of the 90 condominium units were sold prior to December 31, 2007.  Thus, Lodge purchased only 85 of the 90 existing condominium units.

2.      First Financial loaned Lodge $7.5 million to purchase the condominium units and as a result, is the primary secured creditor of Lodge with Lodge, as of the petition date, indebted to First Financial in an amount in the amount of $8,287,176.56. First Financial holds a first position perfected security interest in the Real Property ("Senior Prepetition Lien").  SEC Realty asserts a second position security interest in the Real Property in the original principal amount of $1,775,000.  The Trustee believes this security interest is subject to challenge and is reviewing whether this security interest is subject to subordination, or other avoidance.

3.      Although the original intent was to sell the 85 condominium units, such units did not sell. Quackenbush, through Lodge, consequently operated the 85 condominium units as a hotel from December 31, 2007, to August 2008.  Quackenbush formed Management in August 2008, and shortly thereafter, Management took over operations of Lodge's 85 condominium units and the other five condominium units owned by third parties.

4.      On September 14, 2010, The Lodge at Big Sky, LLC ("Lodge"), commenced a Chapter 11 case by filing a petition for relief under Chapter 11 of Title 11 of the United States Code. On September 14, 2010, The Lodge at Big Sky Management Company, LLC ("Management"), also commenced a Chapter 11 case by filing a petition for relief under Chapter 11 of Title 11 of the United States Code. The two cases were substantively consolidated by Order dated April 8, 2011, with Case No. 10-62229 designated as the lead case ("Debtors"). The Debtors' cases were converted to a Chapter 7 on June 8, 2011, and Trustee was authorized to operate the hotel by Order of the Court dated June 10, 2011, and is operating the hotel in order to preserve its ongoing business value.

5.      The hotel is seasonal, operating for 150 days during the winter and 90 days during the summer.  A separate and small, closely-held corporation, Altitudes, operated a food and beverage service at the Lodge.  Quackenbush is the sole shareholder of Altitudes.  Immediately after the conversion to Chapter 7, Quackenbush shut down the food and beverage service at the Lodge and removed all personal property of Altitude.  The food service at the Lodge has been restored by Trustee and efforts are ongoing to restore the beverage service.

6.      The Trustee has investigated the Debtors' assets and property, has consulted with certain creditors and real estate professionals, and has formulated a liquidation strategy to maximize the value of those assets for the benefit of the creditors and the estate.

7.    First Financial and Trustee have entered into a Stipulation dated June 14, 2011, approved by the Bankruptcy Court by order dated July 13, 2011, whereby Trustee as Seller may sell the Real Property pursuant to Section 363 of the Bankruptcy Code free and clear of liens with liens to attach to the proceeds of the sale.  First Financial has agreed to a carve out from its share of the sale proceeds that, among other things provides for $25,000.00 to unsecured creditors and payment of 90% of the Trustee's administrative fees and expenses.

8.    The Stalking Horse Bidder has proposed to serve as the stalking horse bidder and, if no other Successful Bidder emerges, to purchase the Assets more particularly described in the Asset Purchase Agreement on the terms and conditions contained in the Asset Purchase Agreement.  Should the Stalking Horse Bidder elect to terminate the Asset Purchase Agreement on or before the Due Diligence Date, as defined in the Asset Purchase Agreement, the Trustee will conduct the Auction with the Asset Purchase Agreement establishing the reserve or minimum bid at the Auction.

The Trustee hereby requests that the Court confirm or schedule hearings on the following matters:

| Hearing date and time: | Matters to be considered: |
| --- | --- |
| September 26, 2011 at 9:00 a.m. (the "Bidding Procedures Hearing") | The Trustee's request for entry of an Order (i) authorizing and approving the Asset Purchase Agreement, including, without limitation, the ratification of the validity, priority and perfection of the Senior Prepetition Lien and the right of the First Financial to credit bid as provided therein, subject to higher and better offers; (ii) approving the form and manner of the Notice of Sale and Bidding Procedures; and (iii) approving the Break-up Fee. |
| November 15, 2011 (the "Sale Hearing") | Hearing on the sale of the Assets to the Successful Bidder (including Stalking Horse Bidder), free and clear of Encumbrances (except as stated in this Motion) (the "Sale"). |

**<u>Stalking Horse Bidder's Sale Proposal</u>**[2]

9.      The principal terms of the Asset Purchase Agreement are as follows:

     a.    Seller:  Trustee

     b.    Stalking Horse Bidder:  GSQ FUNDING L.P. (such entity or its designee, transferee or assignee, "GSQ" or "Stalking Horse Bidder").

     c.    Assets to be sold:  The Assets, consisting generally of the Real Property as described on the Exhibit 1 attached to the Asset Purchase Agreement, Permits, all inventory and equipment owned by Seller and used in connection with the Business, including, without limitation, the inventory and equipment listed on the Exhibit 2 (Exhibits 1 and 2 and/or the Asset Purchase Agreement may be revised or amended by the Stalking Horse Bidder with notice to the Trustee until the expiration of the Stalking Horse Bidder's right to terminate the Asset Purchase Agreement and subject to final verification of physical inventory), all reservations and deposits for bookings at the time of closing and all trademarks, trade names, styles, and other intellectual property of Seller, including the name "The Lodge at Big Sky" and all associated marks, provided, however, Assets shall not mean or include any executory contracts or unexpired leases unless such executory contract or unexpired lease is an Assumed Obligation.

     d.    Consideration:   The sum of Two Million Seven Hundred Eighty-Five Thousand Dollars ($2,785,000.00) (the "Purchase Price), $200,000.00 (the "Deposit") paid to the Title Company in cash or immediately available funds on or before the fifth (5th) business day after entry of the Procedures Order (defined in Paragraph 23 below) , and the balance of the Purchase Price shall be paid in cash or immediately available funds, at the Closing. The Purchase Price shall be allocated 95% to the Real Property and 5% to the Personal Property.

     e.    Deposit:  The Deposit has been placed in escrow by the Stalking Horse Bidder.   In the event the Stalking Horse Bidder terminates the Asset Purchase Agreement, the Trustee shall return the Deposit to the Stalking Horse Bidder within two business days after such termination.   In the event Stalking Horse Bidder does not terminate the Asset Purchase Agreement and is not the Successful Bidder, the Deposit will be returned by the Trustee to the Stalking Horse Bidder at the time of Closing with the Successful Bidder or the Back-Up Bidder. In the event the winning bidder is Stalking Horse Bidder, the Deposit shall be credited against the Purchase Price at Closing.

---

[2]  The description herein is intended only as a summary, and the reader is directed to the Asset Purchase Agreement for the definitive and full terms of the agreement between the parties.

f.      Bankruptcy Procedures:  The Asset Purchase Agreement will be subject to competitive bidding procedures as set forth in the Notice of Sale, including an auction process in which Stalking Horse Bidder and First Financial may participate as set forth in the Order Approving Notice of Sale and Bidding Procedures.

g.      In the event the Stalking Horse Bidder terminates the Asset Purchase Agreement on or before the Due Diligence Date, as defined in the Asset Purchase Agreement, the Trustee will conduct the Auction with the Asset Purchase Agreement establishing the reserve bid at the Auction, regardless of whether or not Competing Bids are received. The Trustee will also accept Competing Bids on the Property in accordance with the Bid Procedures.

h.      Sale Free and Clear:  The Assets are to be transferred to Stalking Horse Bidder or Successful Bidder free and clear of any Encumbrances other than Permitted Encumbrances, as defined in the Asset Purchase Agreement.

i.      Court Approval:  It shall be a non-waivable condition to Closing that the Court enter an Order approving the sale of the Assets to Stalking Horse Bidder or Successful Bidder free and clear of all Encumbrances other than the Permitted Encumbrances. (the "Final Sale Order Contingency").

j.      Title Insurance:   It shall be a condition to Stalking Horse Bidder's obligation to purchase the Assets at Closing that American Title & Escrow of Madison County (the "Title Insurer") shall be unconditionally and irrevocably committed at Closing to deliver the Stalking Horse Bidder a standard Owner's Policy of Title Insurance insuring Stalking Horse Bidder's fee simple ownership in the Real Property subject only to the Permitted Encumbrances.

k.      Duration of Asset Purchase Agreement:  The Asset Purchase Agreement shall terminate if the Stalking Horse Bidder terminates the Asset Purchase Agreement in accordance with the terms thereof, or the Stalking Horse Bidder is neither the Successful Bidder nor the Back-up Bidder.  If the Stalking Horse Bidder is the Successful Bidder or the Back-up Bidder, the Asset Purchase Agreement shall remain executory through the close of escrow.  The Successful Bidder shall have until the date that is five (5) Business Days after the Court's entry of the Order approving the Sale to close escrow or such extended date as may be agreed by the Trustee, and the Back-up Bidder shall have an additional five (5) Business days after notification by the Trustee that the Successful Bidder did not close escrow, or such extended date as may be agreed to by the Trustee, to close escrow.

l.      Stalking Horse Bidder's Acknowledgements, Representations, Warranties and Waivers:   Stalking Horse Bidder warrants, among other things, that it

has full power and authority to enter into the Asset Purchase Agreement; that it has and will have the wherewithal as of the Effective Date of the Asset Purchase Agreement and continuing through and including the date of the Closing to perform its obligations; and that it has had a full and complete opportunity to conduct such investigations, examinations, inspections and analyses of the Assets as Stalking Horse Bidder, in its sole discretion, deems appropriate.

m.    Seller's Acknowledgements, Representations, Warranties and Waivers: Subject to the occurrence of the Final Sale Order Contingency, the Seller warrants that he has the full power and authority to enter into the Asset Purchase Agreement and perform all obligations under the Asset Purchase Agreement to grant and convey all interests in the Assets to Stalking Horse Bidder. Otherwise, the Assets are being delivered "AS IS, WHERE IS." The Seller also warrants that neither the Seller nor, to the Sellers' knowledge, the Debtors, have previously assigned, conveyed, acquired from third parties, mortgaged, granted, or otherwise conveyed Assets held by the Trustee or the Debtors other than as reflected in the Permitted Encumbrances other than the Senior Prepetition Lien of First Financial, which shall be satisfied and fully released at the Closing and the claimed second position security interest of SEC Realty, which shall be discharged and no longer attached to the Assets.

n.    Closing Documents:  Closing Documents will include (i) a limited warranty deed, in proper statutory form for recording, duly executed and acknowledged by the Trustee; (ii) such mechanic's lien/parties-in-possession affidavit as may be required by the Title Insurer; (iii) a realty transfer certificate and water rights disclosure; (iv) a Foreign Investment in Real Property Tax Act affidavit; (v) an assignment of the Redemption Right; and (vi) such other conveyance documents, certificates, deeds and other instruments as Stalking Horse Bidder, Seller, or the Title Insurer may reasonably require and as are customary in the transactions in Madison County, Montana or in Bankruptcy Court auctions sales

o.    Property Expenses:  At Closing, any Successful Bidder (including Stalking Horse Bidder) shall assume the obligation to pay any and all post-Closing operating expenses of the Property as well as any real estate taxes not yet paid for the period after the Closing.  No other obligations shall be assumed by the Stalking Horse Bidder except the obligation to honor future hotel room bookings scheduled by Trustee.

10.    Neither the Trustee nor the Debtors hold any financial or other interest in Stalking Horse Bidder.

11.     Accordingly, the Trustee desires to sell the Assets to Stalking Horse Bidder or Successful Bidder in accordance with the terms and conditions of the Asset Purchase Agreement. In the business judgment of the Trustee, such a sale (subject to higher and better offers at Auction) will maximize the sale price of the Assets.

## Sale Free of Claims and Interests

12.     As set forth in this Motion, the Trustee proposes to sell the Property to Stalking Horse Bidder for a purchase price of $2,785,000 (subject to higher and better offers).  The sale price, even subject to higher and better offers, is likely to be substantially less than the aggregate amount of the liens asserted by First Financial and the liens asserted by SEC Realty and the Big Sky Owners Association.

13.     Except as expressly set forth herein, the Trustee seeks to sell the Assets free and clear of all Encumbrances in the Assets, except Permitted Encumbrances, based upon evidence to be presented by the Trustee at the hearing to approve the Sale. The Trustee understands and believes that the Real Property is encumbered by the valid lien and security interest of First Financial, successor to Irwin Union Bank and Trust, ("First Financial") pursuant to that certain Deed of Trust to secure an original indebtedness of $7,531.008.63 ("First Financial Indebtedness"), dated December 31, 2007, and any other amounts and/or obligations secured thereby and recorded in the records of Madison County, Montana on January 3, 2008, as Document 123889 (the "Senior Prepetition Lien").  First Financial has consented to the sale of the Real Property free and clear of the liens and security interests of the First Financial Deed of Trust and the liens of the related agreements and collateral documents on the conditions set forth herein and in the Notice of Sale, including the condition that First Financial receive the net proceeds of the sale of the Real Property, up to the full amount due on the First Financial

Indebtedness after funding of reserves for senior lien claims, and a reserve for the fees and expenses of the Trustee per the existing agreement between First Financial and the Trustee.

14.     Any proceeds from the sale remaining after providing for the applications of the net proceeds of the sale of the Real Property as set forth above shall be paid to junior lien holders in the order of the priority of their lien.

15.     In addition to First Financial's Senior Prepetition Lien, the Trustee understands and believes that the Real Property is encumbered, or claimed to be encumbered, as follows:

> a.     Deed of Trust, to secure an original indebtedness of $1,775,000.00, dated December 31, 2007 and any other amounts and/or obligations secured thereby. Recorded: January 3, 2008 ,  Document No. 123890
>
> Grantor:  The Lodge at Big Sky, LLC
> Trustee:  SEC Realty, LLC
> Beneficiary:  SEC Realty, LLC.
>
> Substitution of Trustee recorded January 3, 2008 as Document No. 123891. American Land Title Company is appointed successor trustee.
>
> b.     Lien.
> Claimant:  Board of Directors of the Big Sky Owners Association, Inc.
> Amount:  $ 30,700.00 plus penalties and interest
> Recorded:  March 26, 2010, as Document No. 135378.

16.     Trustee submits that the liens of the SEC Realty and the Big Sky Owners Association are junior to the Senior Prepetition Lien of First Financial.  SEC Realty and the Big Sky Owners Association could be compelled to release their liens for less than the amount owing in connection therewith in any judicial or non-judicial foreclosure of the Senior Prepetition Lien of First Financial Bank that yields less foreclosure sales proceeds than required to pay the liens of SEC Realty and the Big Sky Owners Association in full, as a matter of non-bankruptcy law. Mont. Code Ann. § 71-1-301 *et seq.*   Therefore, SEC Realty and the Big Sky Owners

Association could be compelled, in a legal or equitable proceeding, to accept a money satisfaction less than a full money satisfaction of its interest under applicable nonbankruptcy law.

17.     In addition, the SEC Realty lien is subject to a bona fide dispute.  The basis for the dispute includes, without limitation, SEC Realty is a voluntarily dissolved entity, and the deed of trust fails to comply with provisions of the Small Tract Financing Act. §25-13-701, *et seq.*, MCA, § 71-1-222, *et seq.* MCA, and § 71-1-301, *et seq*, MCA.

18.     To the extent that any liens are senior in priority to the Senior Prepetition Lien of First Financial Bank, the liens will be paid in full by the Lodge Trustee from the proceeds of the sale of the Real Property upon a final determination of the priority of such liens.

19.     Thus, excepting only (i) Permitted Encumbrances and (ii) liens securing claims for real estate taxes prorated for the period prior to Closing, the Trustee requests that the Court order that the Property be sold free and clear of all Encumbrances.

20.     In the event the Stalking Horse Bidder terminates the Asset Purchase Agreement on or before the Due Diligence Date, as defined in the Asset Purchase Agreement, the Trustee will accept Competing Bids prior to the Auction and will conduct the Auction with the Asset Purchase Agreement establishing the reserve bid at the Auction even if no Competing Bids are received.

21.     The Trustee believes that the sale price of the Assets can be maximized by soliciting higher and better offers through a bankruptcy auction process timed so as to permit a sale of the Assets before the start of the Big Sky ski season.

22.     The Trustee's principal alternative to the sale contemplated herein is to abandon the Real Property and auction the Personal Property upon appropriate orders from this Court, which would allow First Financial to exercise its rights under the Senior Prepetition Lien without

payment of the Carve-out for the benefit of Debtors' estate or competitive bidding attendant to a Section 363 sale.

## RELIEF REQUESTED AND BASIS THEREFORE

### Jurisdiction

23.     The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157(b) and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N), and (O).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for relief sought herein are 11 U.S.C. §§ 105(a), and 363, and Fed. R. Bankr. P. 6004,  and 9019.

### Relief Requested

24.     Through this Motion, the Trustee requests the entry of two separate orders, to be considered at two successive hearings.

25.     First, the Trustee requests that the Court enter an order substantially in the form of Exhibit C attached hereto (the "Procedures Order") at the initial hearing on this matter (the "Bid Procedures Hearing"):  (i) approving the Asset Purchase Agreement attached to this Motion as Exhibit A; (ii) approving notice of the Bid Procedures Hearing and the matters heard and considered by the Court therein as proper, timely, adequate and sufficient notice under the circumstances; (iii) approving the Break-up Fee and directing payment of the Break-up Fee in the event the Stalking Horse Bidder is not the Winning Bidder; and (iv) approving the Notice of Sale substantially in the form attached hereto as Exhibit B, including approving the bidding and sale procedures set forth in the Notice of Sale (the "Bid Procedures").

26.     Second, the Trustee requests the entry of an order substantially in the form of

Exhibit D attached hereto (the "Sale Order")[3]: (i) approving notice of the proposed sale of the Assets, the bidding procedures, the objection period and the Sale Hearing as proper, timely and adequate and sufficient notice under the circumstances; (ii) approving and authorizing the sale of the Assets to the Stalking Horse Bidder or other Successful Bidder free and clear of all Encumbrances, so that the Stalking Horse Bidder or other Successful Bidder shall succeed to any and all rights of Seller in the Assets, including those set forth in the Provisions in Preliminary Declaration for the Mountain Inn at Big Sky Condominium recorded April 28, 2006 as Document No. 112960 and the Final Declaration for the M. I. Condominium recorded May 31, 2006 as Document No. 113541 in the records of the Clerk and Recorder of Madison County, Montana, pursuant to the Bidding Procedures; and (iii) approving and authorizing the payment to First Financial out of escrow of the net proceeds of the sale of the Real Property (other than the proceeds of the sale of the Personal Property), after funding of reserves for senior lien claims, if any, and a reserve for the fees and expenses of the Trustee per the existing agreement between First Financial and the Trustee, and payment of any remaining proceeds to junior lien holders in their order of priority.

## Bidding Procedures

27.     The Trustee requests that the Court approve the following Bidding Procedures, which are set forth more fully in the Notice of Sale and Bidding Procedures:

      a.     To be Qualified Competing Bid, such bid must:

            i.     be in writing and include a mark up of the Asset Purchase Agreement and a redline to the Asset Purchase Agreement showing all changes made by the Bidder, be irrevocable through the closing of the sale of the Assets, and provide that if it is not the

---

[3] The form of Sale Order will be tailored to reflect the outcome of the Auction and the Court's review thereof. The Sale Order should contain the basic provisions set forth in Exhibit D related to the approval of the sale to the Stalking Horse Bidder or the Successful Bidder, as applicable.

winning bid, but is the next highest and best bid, as determined by the Trustee (the "Back-up Bid" made by the "Back-up Bidder"), it may be accepted nonetheless in the event that the Successful Bidder fails to timely close;

ii.    include a signed sale and purchase agreement on terms and conditions no less favorable to the Trustee than the terms and conditions of the Asset Purchase Agreement (the "Bidder's Purchase Agreement");

iii.    include, if applicable, a Sale Order marked to show changes from the "Proposed Sale Order," attached as an exhibit to the Asset Purchase Agreement;

iv.    be submitted in United States dollars;

v.    be for no less than Two Million, Eight Hundred Twenty Thousand Dollars ($2,845,000.00) cash in U.S. Dollars, with the proceeds to be distributed as follows: (i) $50,000.00 to the Stalking Horse Bidder as a Break Up Fee; (ii) approving and authorizing the payment to First Financial Bank, NA ("First Financial") out of escrow of the net proceeds of the sale of the Real Property after funding of reserves for senior lien claims, if any, and a reserve for the fees and expenses of the Trustee per the existing agreement between First Financial and the Trustee, provided however that this amount cannot exceed the indebtedness owed to First Financial that is secured by its Senior Prepetition Lien;  (iii) payment to other lienholders in the order of the priority of the other liens on the Real Property; and (iv) the balance, if any, paid to the Trustee for the benefit of the estate.

vi.    be accompanied by a deposit delivered to the Trustee in the amount of $200,000.00 (the "Good Faith Deposit(s)"), such deposit being either in the form of a certified bank check or a wire transfer, to be held in escrow by the Title Company until the third (3rd) business day after an order approving the sale of the Assets is entered, after which time the Good Faith Deposit(s) of the bidders that were not selected as the Successful Bidder or the Back-up Bidder shall be returned;

vii.    not be conditioned on any contingencies, such as (without limitation) any due diligence investigation, the receipt of financing, or any board of directors, shareholders or other entity approval;

viii.    include evidence of financial wherewithal to consummate the purchase in sufficient specificity and detail as required by the

LITIGATION\3346816.8

Trustee in order that the Trustee may make an informed decision regarding the financial ability of the Bidder to close;

(ix)    fully disclose the identity of the Bidder and the Bidder's organization and all participants therein, including confirmation that its bid is made as principal for the Bidder's account and, if not, the basis upon which the Bidder is acting and the identities of all other participants, if any;

(x)    disclose any agreements or understandings between the Bidder and any third party with respect to the Assets or with respect to any possible transaction involving the Trustees or the Debtors;

(xi)    include electronic contact information for the Bidder;

(xii)    not request or entitle the Bidder to any transaction or break-up fee, expense reimbursement or similar type of payment; and

(xiii)    be received by the Notice Parties on or before the Bid Deadline.

(xiv)    otherwise comply with the Bidding Procedures set forth in the Notice of Sale and Bidding Procedures.

b.    If at least one Qualified Bid is received prior to the Bid Deadline, the Trustee will hold an auction on the date and time and at the location set forth in the Notice of Sale and Bidding Procedures.  At the auction, the minimum increase for subsequent higher offers will be $10,000.00, and bidding will be in increments of at least $10,000.00.

c.    If the Stalking Horse Bidder has not terminated the Asset Purchase Agreement by the Due Diligence Termination Date and no Qualified Bid is received prior to the Bid Deadline, the Trustee will not hold the Auction but will proceed to the Sale Hearing and closing of the transaction with the Stalking Horse Bidder.

d.    If the Stalking Horse Bidder has terminated the Asset Purchase Agreement by the Due Diligence Termination Date;

i.    Qualified Bids may be submitted as set forth in Paragraph 27 a i, ii, iii, and v - x, above, for no less than $2,785,000 cash in U.S. Dollars; and

ii.    regardless of whether or not the Trustee receives a Qualified Bid under paragraph 26(d), the Trustee will conduct the Auction with the Asset Purchase Agreement establishing the opening bid.

LITIGATION\3346816.8

**ARGUMENT**

28.     Section 363(b)(1) of the Bankruptcy Code provides that a trustee, after notice and a hearing, may sell, other than in the ordinary course of business, property of the estate, when a sound business purpose justifies such an action.   11 U.S.C. § 363(b)(1); *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070-71 (2d Cir. 1983). One of the more important factors to be considered in a sale of the assets of the debtor under Section 363(b) is whether the value of the assets are increasing or decreasing in value.  *Lionel*, 722 F.2d at 1070; *accord In re Boogaart of Florida, Inc.*, 17 B.R. 480, 483-84 (Bankr. S.D. Fla. 1981) ("Where, as here, the value of the assets prior to the proposal and confirmation of [a plan] may be desirable because it will ultimately increase the amounts distributed to creditors after [a plan] is confirmed.")  With the passage of time, the value of the Real Property, already depressed as a result of the declining real estate market, will be reduced by real estate taxes and administrative expenses.  If the Real Property is abandoned by the Trustee it will be difficult to continue to operate the hotel, resulting in a loss of the ongoing business value of the Assets that will be realized by the sale plan proposed by the Trustee.  Likewise, the deficiency claims of First Financial and any junior lien holders will increase as a result of accruing interest, accruing taxes and expenses.  It is important to be able to sell the Assets before the bulk of the ski season begins, on or around December 20, 20111, in order to receive the highest and best price.

**I.     IT IS A REASONABLE EXERCISE OF THE TRUSTEE'S BUSINESS JUDGMENT TO SELL THE ASSETS.**

29.     A trustee's business decision to sell its assets other than in the ordinary course of business "should be approved by the court unless it is shown to be so manifestly unreasonable that it could not be based on sound business judgment, but only bad faith, or whim or caprice." *In re Cadkey Corp.*, 317 B.R. 19, 22-23 (D. Mass. 2004).  Generally, where it appears from a

review of all the facts and circumstances that a sale is in the best interests of the estate, a court will not disturb the trustee's business judgment regarding the terms of a proposed sale absent some compelling reason to do so.  *See generally* 2 Collier on Bankruptcy at ¶ 363.03 (15th ed. Rev. 2008); *In re Canyon Partnership*, 55 B.R. 520, 524 (Bankr. S.D. Cal. 1985); *In re Enrst Home Center, Inc.*, 209 B.R. 974, 979 (Bankr. W.D. Wash. 1997).  Federal Rule of Bankruptcy Procedure 6004 provides that the sale of property outside the ordinary course of business may take place by private sale.  Fed. R. Bankr. P. 6004(f)(1).

30.     Here, the decision of the Trustee to sell the Assets is supported by sound business judgment.  The Stalking Horse Bidder has proposed to purchase the Assets at a price that approximates the fair market value of the Assets and that is acceptable to the Trustee.  First Financial has the senior lien on the Real Property.  The junior lien holders of the Real Property would not likely realize any proceeds in the event First Financial completes its foreclosure of the Real Property.  The Trustee believes that the Assets must be sold now in order to preserve any value of the Real Property for the benefit of the estate.  Based upon the foregoing, the Trustee believes that Stalking Horse Bidder's bid (subject to higher and better offers) represents a fair and reasonable price for the Assets.

## II.     THE SALE IS PROPOSED IN GOOD FAITH.

31.     Courts have also required that the sale price be reasonable and that such sale result in an arm's length, good faith negotiations with the buyer.  *See e.g. In re Roger N. Fearing*, 143 Fed. Appx. 744, 745-46 (9th Cir. 2005); *In re Abbots Dairies of Pa.*, 788 F.2d 143, 147-50 (3d Cir. 1986).  "Absence of 'good faith' is shown by fraud, collusion between the purchaser and the other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."  *Fearing* at 746.  None of the elements that would imply an absence of good faith

are present in the contemplated transaction.  Instead, the Asset Purchase Agreement has been negotiated in good faith, in a fair manner, and from arms' length bargaining positions.

32.     The Stalking Horse Bidder is an independent and separate third party wholly unrelated to the Trustee and the Debtors, and is not expressly or impliedly agreeing to assume any debts of the Debtors, unless expressly set forth in the Asset Purchase Agreement.  The contemplated transaction does not amount to a consolidation, merger or *de facto* merger of the Debtors and any entity controlled by the Stalking Horse Bidder.

## III.     THE BIDDING PROCEDURES ARE FAIR.

33.     The Bidding Procedures set forth in the Notice of Sale and Bidding Procedures are intrinsically fair to all parties and are designed to permit the estate to obtain the benefit of the best possible price for the sale of the Assets.  The $60,000.00 initial overbid as proposed in the Bidding Procedures is intended to cover repayment of the Stalking Horse Bidder's breakup, plus $10,000 required incremental bid.  The $10,000.00 minimum increase required for subsequent higher offers, as proposed in the Bidding Procedures, is a reasonable increment for further bids, constituting less than 1% of the offer of the Stalking Horse Bidder.  The Trustee is confident that the Successful Bid that emerges from this process will be the highest and best bid presently obtainable for the Assets.

34.     The paramount goal in any proposed sale of estate property is to maximize the proceeds received by the bankrupt estate.  *See e.g. FourB. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997)(stating that in bankruptcy sales, "a primary objective of the [Bankruptcy] Code [is] to enhance the value of the estate at hand"); *The Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992)("It is a well-established principle of

bankruptcy law that the objective of the bankruptcy rules and the trustee's duty to such sales is to obtain the highest price or greatest overall benefit possible for the estate.")(citation omitted). Courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate, and are appropriate in the context of bankruptcy sales. *See e.g. Integrated Resources*, 147 B.R. at 659 (such procedures should "encourage bidding and ... maximize the value of the debtor's assets").

35.     Bidding procedures must accomplish conflicting tasks. They must provide sufficient protection for the Stalking Horse so that an offer will be made. That first offer then allows a trustee to seek overbids with the confidence that there is already an acceptable offer in hand. At the same time, the protections for the stalking horse must not be so substantial as to unduly restrict the overbidding. The Trustee believes that the proposed sale and bid procedures accomplish these objectives.

36.     Specifically, the minimum initial overbid amount of $2,845,000.00 (approximately 2.15% over Stalking Horse Bidder's purchase price, including the $10,000 bidding increment) is designed to be substantial enough to discourage parties not seriously interested in bidding and closing the transaction, but not so large as to make overbidding a practical impossibility. Each subsequent overbid will generate at least another $10,000.00 net benefit to the estate.

37.     Many courts have approved similar minimum overbids. *See e.g. In re Fin. News Network, Inc.*, 126 B.R. 152, 154 (S.D.N.Y. 1991)($10 million overbid protection on a $105 million sale transaction approved (approximately 10%); *Integrated Resources*, 147 B.R. at 655 (overbid of $15 million on a $565 million sale transaction (approximately 2.7%)). As such, the

minimum overbid amount and subsequent incremental overbids will enhance the sale price of the Assets, and will not discourage bidding.

38.     The other terms of the sale and bid procedures, such as how and when an interested party may qualify and then bid, are also designed to limit bidding to serious parties.  A party must post a meaningful deposit ($200,000.00) on or before the Bid Deadline in order to be a Qualified Bidder at the auction.  Since the Successful Bidder will lose its deposit if it fails to close the sale, the estate will be compensated for the time and effort of the Trustee and his professionals in selling and auctioning the Assets.  While the Trustee welcomes a higher and better offer, he wants to ensure that such offers come only from credible parties likely to close the transaction.

39.     Accordingly, the Trustee respectfully submits that the proposed sale of the Assets is entirely consistent with the guidelines adopted by the courts, and that a prompt sale is in the best interests of the creditors and the estates, and will maximize the amount that the estate may realize for the value of the Assets.

40.     Lastly, while it is likely that the greatest beneficiary of the highest economic sale is First Financial, the sale as proposed herein has value to creditors who may never recover all their claims.  If First Financial is forced to foreclose its liens, at least one ski and selling season will be lost.  On the other hand, a sale before the 2012 skiing season will ensure that employees will keep their jobs, provide an opportunity for tradesmen and ensure that tax revenues will continue to be generated.

## IV.    THE TRUSTEE CAN SELL THE ASSETS FREE AND CLEAR.

41.     Section 363(f) of the Bankruptcy Code provides that:

The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—

(1)    applicable bankruptcy law permits sale of such property free and clear of such interest;

(2)    such entity consents;

(3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)    such interest is in bona fide dispute; or

(5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

42.    The Trustee submits that the Assets may be sold free and clear of the liens of any third parties. First, if a party does not object, it should be deemed to have consented to a sale free and clear of interests. *See Futuresource LLC v. Reuters Ltd.*, 312 F.3d 281, 285-286 (7th Cir. 2002) (in a sale conducted pursuant to section 363 of the Bankruptcy Code, lack of objection (provided of course there is notice) counts as consent."). First Financial has consented to the sale. Further, all other lienholders on the Real Property, have liens that are junior in priority to First Financial. Thus, in a foreclosure of First Financials' lien, all the junior lienholders could be compelled to accept less than a full money satisfaction of their respective interests under applicable nonbankruptcy law. Mont. Code Ann. § 71-1-301 *et seq. See In re Jolan, Inc.*, 403 B.R. 866, 870 (Bankr. W.D. Wash. 2009); *In re Boston Generating, LLC*, 440 B.R. 302, 333 (Bankr. S.D.N.Y. 2010); *In re Thorpe Insulation Company*, 2011 WL 1378537(April 11, 2011, D.C. C.D. Cal.); *Amco Capital Group*, 2011 WL 2312092011. The Trustee expressly reserves the right to challenge the validity, priority, and perfection of such junior interests, but for purposes of this Motion, observes that each such interest is reducible to an unsecured claim. In

addition, SEC Realty's junior lien may be ineffective because SEC Realty may be in dissolution or otherwise impaired.

43.     The facts of this case, therefore, are distinguishable from the facts and analysis in *Clear Channel Outdoor, Inc. v. Knupfer (In re PW, LLC)*, 391 B.R. 25 (9th Cir. B.A.P. 2008). In *Clear Channel,* the parties failed to demonstrate the applicability of 11 U.S.C. 363(f)(5) or any other section of 11 U.S.C. 363(f) under the circumstances of that case. *See Clear Channel*, 391 B.R. at 46. In this case, on the other hand, the Trustee has demonstrated that the Assets may be sold free and clear of such interests pursuant to 11 U.S.C. 363(f)(2), (4) and (5), and perhaps otherwise. Mont. Code Ann. § 71-1-301 *et seq.* Furthermore, *Clear Channel* has been roundly criticized, and even courts in the Ninth Circuit have refused to apply it. *E.g., Namco Capital Group, Inc.,* 2011 WL 12090 (D., C.D. Cal., June 7, 2011); *In re Thorpe Insulation Co., supra.*

## Assumption and Assignment of Unexpired Leases and Executory Contracts

44.     The Asset Purchase Agreement does not require the Stalking Horse Bidder to assume any executory contracts related to the Assets except the hotel bookings incurred by the Trustee that remain in place at the time of closing, and the contract between the Trustee and Lone Peak Hospitality.

## The Break-Up Fee Is an Exercise of the Trustee's Business Judgment, is an Actual, Reasonable and Necessary Expense, and the Stalking Horse Bidder has made a Substantial Contribution to the Bankruptcy Case.

45.     It is critical to realizing the maximum value from the Assets that they be sold at a time that permits them to be utilized by the purchaser during the 2011-2012 ski season, which starts with Thanksgiving weekend. The Stalking Horse Bidder has established a very desirable and competitive floor for bidding, and has agreed to a Break-up Fee of less than 1% of the purchase price, which is significantly less than the customary break-up fees.

46.     Compensating the Stalking Horse Bidder with the promised Break-up Fee is an actual and necessary expense to preserve the value of the estate in providing an incentive to the Stalking Horse Bidder to do the initial research, due diligence and bid preparation to effectuate the bankruptcy auction and sale.  The holder of the Senior Lien, First Financial, who will not be paid in full if the Trustee closes on the Stalking Horse Bid, supports payment of the Break-up Fee.

47.     The Trustee believes that the proposed commitment to pay the Break-up Fee is a justifiable exercise of good business judgment.  The Break-up Fee was the result of arm's length negotiations in which the Stalking Horse Bidder made significant concessions, the Break-up Fee encourages bidding and the amount is extremely reasonable and minimal in light of the prospective purchase price and the due diligence efforts required in this case.

### There are Compelling Circumstances for an Immediate Closing and Transfer

48.     It is a condition of the sale that the sale close by December 9, 2011, because the Stalking Horse Bidder will only pay the price proposed in this purchase if the Closing on the Sale will occur at a time that will permit the Assets to be utilized at the beginning of the 2011-2012 ski season.  That means that the Assets must have been transferred and prepared for operations, including advertising and accepting reservations and staffed for full operations, before the beginning of the Christmas ski season.  No times have been shortened in connection with the proposed sale, and all parties have had ample opportunity to consider and submit competitive bids for objections to the sale.

49.     There is no just reason for delay in the implementation of the Orders requested in this Motion, and the Court should expressly direct the entry of immediate judgment, and the effectiveness of the Order Approving the Sale Procedures and then the Order Approving the Sale

should not be stayed under Bankruptcy Rule 6004(h) and should, instead, be effective immediately.

**All Required, Proper and Appropriate Notice Has Been Provided**

50.    The Trustee has provided copies of this Motion, the proposed Order Approving Notice of Sale and Bidding Procedures for the Sale of Real and Personal Property of the Estate, Free and Clear of all Claims, Interests, and Encumbrances and Granting Related Relief, and the Notice by Chapter 7 Trustee of Bidding Procedures and Intended Sale of Real and Personal Property and Deadline for Submitting Objections and Higher Offers and Hearing Date (the "Sale Motion, Orders and Notice') to all persons appearing on the Creditors Matrix and all persons who have requested Notice in this case, to all persons or entities holding record interests or secured claims in the Assets, to all governmental agencies or bodies having any liens or other interests in the Assets, and to all other persons or entities having any interests in, claims, liens or encumbrances of any kind against the Assets (all such persons to whom notice was provided, the "Notice Parties") , as shown in the Certificate of Service to be filed after service of this Motion.

**CONCLUSION**

**WHEREFORE**, the Trustee respectfully requests that the Court enter orders:

(a)    authorizing and approving the sale of the Assets (as hereinafter defined) free and clear of all Encumbrances (the "Sale"):

   (i)    pursuant to Section 363 of the Bankruptcy Code [11 U.S.C. § 363] and pursuant to an Asset Purchase Agreement substantially in the form attached hereto as Exhibit A by and between the Trustee and Stalking Horse Bidder; or

   (ii)    pursuant to Section 363 of the Bankruptcy Code to a qualified bidder who makes the highest and best offer for the Assets at the Auction pursuant to the Bidding Procedures as the same may be approved by the Court (a "Successful Bidder," which term, to the extent required, shall include the Stalking Horse Bidder);

(b)    approving the Break-up Fee and directing payment of the Break-up Fee in the

event the Stalking Horse Bidder is not the winning bidder;

(c)   approving the Bidding Procedures as set forth in the (Proposed) Notice of Sale form attached hereto as Exhibit B;

(d)   approving and authorizing the payment to First Financial Bank, NA out of escrow of the net proceeds of the sale of the Real Property after funding of reserves for senior lien claims, if any, and a reserve for the fees and expenses of the Trustee per the existing agreement between First Financial Bank, NA, and the Trustee;

(e)   approving the form and manner of notice of the proposed sale and Bidding Procedures, substantially in the form attached hereto as Exhibit B, (Proposed) Notice of Sale;

(f)   ruling that any objections to the sale of the Assets, or the sale of the Assets free and clear of all liens, encumbrances, and other interests in the Assets that are not resolved at the Bidding Procedures Hearing are to be considered and ruled upon by the Court at the Sale Hearing;

(g)   Establish the Due Diligence Termination Date for the Stalking Horse Bidder as defined in the Asset Purchase Agreement;

(h)    scheduling a time and place at which the Auction is to be conducted;

(i)   scheduling a Sale Hearing at which the results of the Auction is to be approved or disapproved by the Court and any objections not resolved at the Bid Procedures Hearing or that require an evidentiary hearing are to be ruled upon by the Court; and

(j)   granting such other and further relief as is just and proper.

**DATED** this  2nd  day of September, 2011.

JOSEPH V. WOMACK
IN HIS CAPACITY AS CHAPTER 7
TRUSTEE AND NOT INDIVIDUALLY


 /s/  Joseph V. Womack
        Joseph V. Womack

LITIGATION\3346816.8

## NOTICE OF OPPORTUNITY TO RESPOND

**If you object to the Trustee's motion as set forth above, you must file a written responsive pleading and request a hearing within fourteen (14) days of the date of this notice.**

**Creditors and Interested Parties are further notified that a the Trustee has filed a motion requesting a hearing on this motion be set for September 26, 2011, in Butte, Montana.  Notice of the hearing date and time will be sent to all creditors and parties in interest.**

**If no objections are timely filed, the court may grant the relief requested.  A failure to respond by any entity shall be deemed an admission that the relief requested should be granted.**

**DATED** this  2nd  day of September, 2011.

**WALLER & WOMACK, PC**


By: /s/ Joseph V. Womack
        Joseph V. Womack
        Attorney for Trustee

## CERTIFICATE OF SERVICE

I, the undersigned, certify under penalty of perjury that on this  2nd  day of September, 2011, or as soon as possible thereafter, copies of the foregoing Motion were served electronically by the Court's ECF notice to all persons/entities requesting special notice or otherwise entitled to the same and that in addition service by mailing a true and correct copy, first class mail, postage prepaid, was made to the following persons/entities who are not ECF registered users:

**Debtors:**

The Lodge at Big Sky, LLC                    The Lodge at Big Sky Management Company, LLC
P.O. Box 160938                              P.O. Box 160938
Big Sky, MT 59716-0938                       Big Sky, MT 59716-0938

**Interested Parties:**

Please see attached Creditor Mailing Matrix

By: /s/Ashley Anvik-Ellison
        Ashley Anvik-Ellison
        Legal Asst. to Trustee

Printed:  09/02/11 12:01 PM

# Creditor Mailing Matrix

Page:  1

### Case No.:  10-62229

| Name | Address | City | State | Zip |
|------|---------|------|-------|-----|
| ABACO ENERGY SERVICES | 8606 ISLAND ROAD | BISMARCK | ND | 58503 |
| ALLTELL | PO BOX 79033 | PHOENIX | AZ | 85062-9033 |
| ALSCO | PO BOX 30496 | BILLINGS | MT | 59107-0496 |
| ALTITUDES INC | PO BOX 161945 | BIG SKY | MT | 59716-1945 |
| AMERICAN EXPRESS | C/O BECKET & LEE<br>PO BOX 3001 | MALVERN | PA | 19355-0701 |
| BANK OF AMERICA | P.O. BOX 15710 | WILMINGTON | DE | 19886-5710 |
| BIG SKY COUNTY WATER | PO BOX 160670 | BIG SKY | MT | 59716-0670 |
| BIG SKY OWNERS ASSOCIATION | P.O. BOX 160057 | BIG SKY | MT | 59716-0057 |
| BIG SKY RESORT AREA DISTRICT | PO BOX 161331 | BIG SKY | MT | 59716-1331 |
| BRAD LIPHAM | 1715 TYUS CARROLLTON | CARROLLTON | GA | |
| BRANDON BROWN | 91 WHITE SANDS DR | BILLINGS | MT | 59102-7713 |
| BROCK SHORT | PO BOX 161024 | BIG SKY | MT | 59716-1024 |
| CHERYL TIBBETTS | 58 ROSE PARK DR<br>TORONTO, ON, CANADA, M4T 1R1 | | | |
| DAN PARKER | 4670 WHITEFIELD RD | COLUMBUS | GA | 31904 |
| DANIEL SATUSKY | 6297 RIDGELINE DR | MEMPHIS | TN | 38115-3498 |
| DAVID FORD | 4104 PALISADES PK DR | BILLINGS | MT | 59106-1401 |
| DEX MEDIA WEST | ATTN: CUSTOMER CARE<br>PO BOX 3900 | PEIORIA | IL | 61612-3900 |
| ELECTRO CONTROLS | PO BOX 2669 | MISSOULA | MT | 59806-2669 |
| ELIZABETH SMITH | 12610 BROOKFIELD PK | HOUSTON | TX | 77041-7255 |
| EMPLOYERS COMPENSATION INSURANCE COMPANY | 412 E PARKCENTER BLVD, STE 320 | BOISE | ID | 83706-7565 |
| GMAC MORTGAGE | P.O. BOX 1330 | WATERLOO | IA | 50704-1330 |
| GRANITE TCS, INC | PO BOX 7260 | BOZEMAN | MT | 59771 |
| HEATHER VOGEL | 8510 SOUTHFIELDS CIRCLE | LUTHERVILLE TIMO | MD | 21093-3979 |
| HENTZ MCCLELLAN | 17518 NE TERESA TERRACE | BLOUNTSTOWN | FL | 32424-1275 |
| HOUSE OF CLEAN | PO BOX 1203 | BOZEMAN | MT | 59771-1203 |
| INTERNAL REVENUE SERVICE | ATTN: J HARRIS & YVONNE TIBBS<br>1999 BROADWAY  M/S 5012DEN | DENVER | CO | 80202-3025 |
| INTERNAL REVENUE SERVICE | CENTRALIZED INSOLVENCY OPERATIONS<br>PO BOX 7346 | PHILADELPHIA | PA | 19101-7346 |
| JEFFREY R. QUACKENBUSH | P.O. BOX 161945 | BIG SKY | MT | 59716-1945 |
| JILL ENDRES | 3656 MESCALERO TRAIL | BILLINGS | MT | 59106-9518 |
| JIM LUNDSTROM | 15328 TOSTEN ERICKSON | LAKE PARK | MN | 56554-9140 |
| JOHN GOEMANS | 315 MOBILE AVE | DAYTONA BEACH | FL | 32118-4734 |
| JOHN STEWART | SEC REALTY | ACME | MI | 49610-1567 |

Printed:  09/02/11 12:01 PM

# Creditor Mailing Matrix

Page:  2

### Case No.:  10-62229

| Name | Address | City | State | Zip |
|------|---------|------|-------|-----|
| | P.O. BOX 1567 | | | |
| KELI BEDICS | 3561 SOUTH STAFFORD ST | ARLINGTON | VA | 22206-1824 |
| KEN HOYDIC | 6412 FOX GRAPE LANE | BRADENTON | FL | 34202-2020 |
| KENNETH KEMPF | 10096 REGATTA TRAIL | AURORA | OH | 44202-9079 |
| KNAUB & COMPANY | PO BOX 161030 | BIG SKY | MT | 59716 |
| LODGING FACILITY SALES & USE | MT DEPT OF REVENUE PO BOX 5835 | HELENA | MT | 59604-5835 |
| MARK BOWER | 596 COVERED BRIDGE RD | CONFLUENCE | PA | 15424-2375 |
| MARK STEVENSON | 1758 CRYSTAL DR | BILLINGS | MT | 59106-1709 |
| MARK TEDSON | P.O. BOX 160133 | BIG SKY | MT | 59716-0133 |
| MARTIN CORDEAUX | HILLOCK HOUSE LANCS KNOLL LANE LITTLE | | | |
| MICHAEL ROSS | 4636 N. RORRIDON WAY | BOISE | ID | 83702-1672 |
| MILTON WOODRUFF | 4927 GASKIN WOK | MARIETTA | GA | 30068-2106 |
| MONTANA DEPT OF REVENUE | ATTN: KIM DAVIS PO BOX 7701 | HELENA | MT | 59604-7701 |
| MSI MULTISYSTEMS | 7600 NORTH 15TH ST NO 2 | PHOENIX | AZ | 85020-4327 |
| PATSY PERETTI | 2625 RIDGEWOOD LN | BILLINGS | MT | 59106-1574 |
| PEGASUS SOLUTIONS, INC | COMMISSIONS RESEARCH DEPARTMENT PO BOX 600937 | DALLAS | TX | 75360 |
| REGGIE KELLEY | 2729 NACEY ST | COLUMBUS | GA | 31906-1252 |
| REGIONS MORTGAGE, INC | REO DEPARTMENT 215 FORREST STREET | HATTIESBURG | MS | 39401 |
| RIVER ROCK INVESTMENTS | ATTN: TIMOTHY RYAN PO BOX 160700 | BIG SKY | MT | 59716 |
| ROGER SPRAGG | 13752 MERCADO DR | DEL MAR | CA | 92014-3416 |
| RON HILL | P.O. BOX 50636 | BILLING | MT | 59105-0636 |
| SANDY DOW | 830 RUTTER AVE | LANCASTER | OH | 43130-2735 |
| SANDY LUNDSTROM | 21729 HOLMAN POINT DR | NISSWA | MN | 56468-2377 |
| SAUNDERS OUTDOOR ADVERTISING | 1764 WEST 2900 SOUTH | OGDEN | UT | 84401-3255 |
| STACEY ROTHER | 1906 20TH AVE S | MOORHEAD | MN | 56560-4747 |
| STEPEHN INGRAM | 2180 HARE PLACE | DALLAS | VA | 20189-2179 |
| TERRI COOPER | 78 SAINT IVES CROSSING | WINDER | GA | 30680-7403 |
| THYSSENKRUPP ELEVATOR CO | 378 BRIAR PLACE, UNIT 1 | BELGRADE | MT | 59714-7581 |
| TRAVELWEB LLC | PO BOX 915204 | DALLAS | TX | 75391-5204 |
| TRISSA SANDERSON | 1125 DAVID TRACT | SUWANEE | GA | 30024 |
| UNEMPLOYMENT INSURANCE | PO BOX 8020 | HELENA | MT | 59604-8020 |

Printed:  09/02/11 12:01 PM

# Creditor Mailing Matrix

Page:  3

## Case No.:  10-62229

| Name | Address | City | State | Zip |
|------|---------|------|-------|-----|
| US SECURITIES & EXCHANGE COMMISION | ATTN: BANKRUPTCY COUNSEL<br>5670 WILSHIRE BLVD, 11TH FLOOR | LOS ANGELES | CA | 90036-5627 |
| WARD VAUGHAN | 202 BROOKNEIL DR | WINCHESTER | VA | 22602-6652 |
| WILLIAM LEE | 6207 WINNEQUAH RD | MADISON | WI | 53716-3461 |
| WILLIAMS BRITT | 115 PARK AVENUE | STATESBORO | GA | 30458-5110 |

**Total:** 66